# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

SHOOK, INC. HEAVY & ENVIRONMENTAL DIVISION,

    Plaintiff,

vs.

CITY OF MOUNDSVILLE WATER BOARD,

    Defendant.

Case No. 3:09cv00210

District Judge Walter Herbert Rice
Magistrate Judge Sharon L. Ovington

## REPORT AND RECOMMENDATIONS[1]

## I.  Introduction

Plaintiff Shook, Inc. Heavy & Environmental Division is a general contractor with its principal place of business in Dayton, Ohio. Defendant City of Moundsville Water Board is a municipal utility located within the City of Moundsville, West Virginia. Plaintiff Shook claims that Defendant Moundsville has breached the terms of the parties' multi-million dollar contract concerning Plaintiff Shook's construction of a water treatment facility in Moundsville, West Virginia.

Plaintiff Shook's Complaint asserts that this Court has jurisdiction over Defendant Moundsville under 28 U.S.C. §1132 because complete diversity exists between the parties and the amount in controversy exceeds $75,000.

The case is presently pending upon Defendant Moundsville's Motion to Dismiss

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendations.

under Fed. R. Civ. P. 12(b)(2) or, in the Alternative, to Transfer under Fed. R. Civ. P. 12(b)(3) (Doc. #4), Plaintiff Shook's Memorandum in Opposition (Doc. #9), the affidavit of Ronald K. Mellon (Doc. #10), Defendant Moundsville's Reply (Doc. #12), Defendant Moundsville's Supplement (Doc. #19), Plaintiff's Notice of Reliance on Affidavit of Ronald K. Mellon and Supplemental Memorandum (Doc. #20), and the record as a whole.

## II.   Factual Background

### A.   Plaintiff Shook's Complaint

Plaintiff Shook alleges in the Complaint that on or about December 21, 2005 Defendant Moundsville and Plaintiff Shook entered into a written contract concerning the construction of a new water treatment facility in Moundsville, West Virginia. Under the parties' contract, Plaintiff Shook agreed to provide general construction services for the new water treatment facility. Plaintiff Shook constructed the new facility in about two and one-half years.

Pursuant to the parties' contract and during the course of the project, Defendant Moundsville made periodic payments to Plaintiff Shook totaling in excess of 15.5 million dollars. On June 19, 2008, Plaintiff Shook notified Defendant Moundsville's engineer that the project was totally complete. Plaintiff Shook asserts that Defendant Moundsville has refused to pay the remaining $200,000.000 due to Plaintiff Shook under the parties' contract.

The Complaint raises three Counts: (1) breach of contract, (2) breach of good faith and fair dealing, and (3) unjust enrichment/quantum meruit.

### B.   Plaintiff's Burden and the Factual Background

Plaintiff Shook bears the burden of establishing that this Court may exercise personal jurisdiction over Defendant Moundsville. *See Neogen Corp. v. Neo Gen Screenwriting, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). "When the district court holds an evidentiary hearing to determine jurisdiction, Plaintiffs must make more than just a

'prima facie showing.' Plaintiff must establish jurisdiction by a preponderance of the evidence." *Youn v. Track, Inc*., 324 F.3d 409, 417 (6th Cir. 2003) (citing *Serras v. First Tenn. Bank Nat. Ass'n.,* 875 F.2d 1212, 1214 (6th Cir. 1989)).

On February 8, 2010, the Court held an evidentiary hearing during which Plaintiff Shook presented the testimony of its Vice President, Ronald "Joe" Mellon, and its Chief Financial Officer, Diane Brush; Defendant Moundsville presented the testimony of its Superintendent, James F. Woods. Many documents were admitted into evidence. The evidence revealed the following.

Defendant Moundsville Water Board's purpose is to provide safe and potable water to approximately 4,500 customers, none of whom live in Ohio. Defendant Moundsville does not have offices in Ohio or representatives with offices in Ohio.

Joe Mellon, and hence Plaintiff Shook, learned about Defendant Moundsville's intent to build a new water treatment facility in West Virginia (the Project) by using an Internet web-based search engine known as the Dodge Network or Dodge Plans. Plaintiff Shook's Complaint explains, "a search engine called Dodge Plans ... is part of the McGraw Hill Construction Network of The McGraw-Hill Companies..., and to which Ohio contractors, including Shook subscribe." (Doc. #1 at ¶13). Mellon testified that the Dodge Network contains a national database where a contractor can track jobs geographically or by job type. Plaintiff Shook tracks jobs in several states including, in part, Ohio, West Virginia, Indiana, and Kentucky.

Defendant Moundsville's Superintendent, James F. Woods, states in his affidavit that to the best of his knowledge, Defendant Moundsville did not pay for distribution of materials about the Project on the Dodge Network. (Doc. #4, Woods' Affidavit at ¶13). Woods further states that he was aware that information about the Project "was distributed on the Dodge Network, but the Dodge Network did not provide any information to the Moundsville Water Board." *Id*. Woods further states, "[T]he Moundsville Water Board does not place notices about its bidding opportunities in

publications in states other than West Virginia." *Id*. Woods testified that Defendant Moundsville did not have or maintain an Internet website capable of receiving or collecting information from individuals or businesses. Neither Defendant Moundsville nor Plaintiff Shook has presented evidence specifically explaining how the information about the Project found its way into the Dodge Network.

Mellon was in Plaintiff's Shook's headquarters in Dayton, Ohio when he searched the Dodge Network and learned about the Project. When Mellon first learned about the Project, it was too late to prepare a bid, and Plaintiff Shook did not participate in the first round of bidding. But the first round of bidding did not result in the award of a contract.

Mellon later searched the Dodge Network – again from Plaintiff Shook's headquarters in Ohio – and learned that it would be open for re-bidding. Mellon purchased the required specifications and plans and prepared Plaintiff Shook's bid in Ohio. Plaintiff Shook's "Invitation to Bid" establishes that the bidding and contract documents including plans and specifications were on file and available upon request from Gwin, Dobson & Foreman, Inc. at its address in Altoona, Pennsylvania. (Defendant's Exhibit B). Bidding and contract documents were also available at four locations in West Virginia and two other locations in Pennsylvania. (Defendant's Exhibit C at Article 21). The Invitation to Bid also stated, "Each successful bidder will be required to comply with any and all applicable local and State of West Virginia rules, regulations, and laws." (Defendant's Exhibit B at p. 00100-2).

Joe Mellon attended one or two hearings in Moundsville, West Virginia during the re-bid proceedings. Plaintiff Shook submitted its bid to Defendant Moundsville in West Virginia on August 17, 2005. One document Plaintiff Shook completed and submitted with its bid was titled, "Qualification and Responsibility Questionnaire for Contractors." (Defendant's Exhibit D). In this document Plaintiff Shook represented, approximately 80% of its work force on the Project would consist of employees who reside in and around Marshall County, West Virginia. *Id*. In this document, Plaintiff Shook identified

4

its Project Supervisor as Frank Guzzi, whose address was in Bridgeport, West Virginia. Plaintiff Shook's Project Foreman was Ricky Haller, a resident of Philippi, West Virginia. *Id.*

Only two other general contractors submitted re-bids on the Project; each was based in Ohio. Defendant Moundsville accepted Plaintiff Shook's bid on October 20, 2005. Defendant Moundsville could have rejected Plaintiff Shook's bid, but it accepted Plaintiff Shook's bid because it was the lowest.

A relatively brief period of negotiation followed, during which Plaintiff Shook satisfied certain post-bid requirements such as obtaining a performance bond, which was countersigned by Glen P. Crouse as "Resident West Virginia Agent." (Plaintiff's Exhibit 4 at p. 00600-13). The parties' finalized and executed their contract on December 21, 2005.

The contract provided that notices would be sent to Defendant Moundsville at its address in Moundsville, West Virginia. Notices would be sent to Plaintiff Shook at its address in Dayton, Ohio. (Plaintiff's Exhibit 6 at 6).

During the re-bidding proceedings, Defendant Moundsville neither targeted nor excluded contractors from a specific state from its search for a general contractor. Defendant Moundsville did not send any invitation or instructions to bid on the Project to Plaintiff Shook in Ohio or to any contractor in Ohio.

When Plaintiff Shook received the Notice to Proceed in or near December 21, 2005 (Plaintiff's Exhibit 7), it began its formal process for the Project by, for example, assembling materials, contacting or obtaining subcontractors, and setting up at the Project site. Plaintiff Shook's planning, scheduling, fabrication, and mobilization for the Project occurred in and from Ohio. Throughout the course of the Project, monthly meetings were held at the Project site in Moundsville, West Virginia.

The Project was partly funded by the federal government. As a result, federal regulations required the general contractor to comply with certain contractual terms

relating to the goal of achieving participation in the Project by subcontractors who are Minority-owned Business Enterprises/Women-owned Business Enterprises (MBE/WBE). The lists of possible MBE/WBE subcontractors included businesses nearly all of whom were located in either West Virginia, Virginia, Pennsylvania, or Ohio. *See, e.g.,* Doc. #1, Exhibit A. Defendant Moundsville did not create the MBE/WBE lists. It instead obtained the lists from the State of West Virginia.

Defendant Moundsville sent periodic payments to Plaintiff Shook in Dayton, Ohio because that is where Plaintiff Shook's headquarters is located. Defendant Moundsville paid more than 15 million dollars to Plaintiff Shook for work on the Project. Plaintiff Shook deposited the payments in its office bank account with National City Bank in Dayton, Ohio. Plaintiff Shook submitted to Defendant Moundsville a final application for payment in the amount of $787,912.03. (Plaintiff's Exhibit 29). Defendant Moundsville acknowledges that it has not paid $200,000.00 of the final payment requested by Plaintiff Shook.

In September 2009 the Moundsville Water Board filed a Complaint in the Circuit Court of Marshall County, West Virginia naming as one of several defendants Shook, Inc., Heavy & Environmental Division. (Defendant's Exhibit E). The defendants in the state case removed it to the United States District Court for the Northern District of West Virginia based on diversity jurisdiction. The District Court in West Virginia denied the Moundsville Water Board's Motion to Remand the case to state court, and the case thus remains presently pending in federal court in West Virginia.

The Moundsville Water Board's Complaint in federal court in West Virginia concerns the same contract and Project at issue in the instant case and claims, in part, that Shook, Inc. breached the parties' contract by failing to construct certain filters in the manner the contract required. In its Complaint the Moundsville Water Board seeks to recover from Shook, Inc. in excess of $225,000 in actual damages plus $662,000 in liquidated damages.

6

The Project is the only business Defendant Moundsville has ever conducted with Plaintiff Shook. Defendant Moundsville does not have plans for any ongoing business relationship with Plaintiff Shook.

### III. <u>Motion To Dismiss – Personal Jurisdiction</u>

"Personal jurisdiction can be either general or specific, depending upon the nature of the contacts that the defendant has with the forum state." *Bird v. Parsons*, 289 F.3d 865, 873 (6th Cir. 2002).

Defendant Moundsville argues that this Court lacks both general and specific personal jurisdiction over it, and as a result, Plaintiff Shook's Complaint must be dismissed under Fed. R. Civ. P. 12(b)(2).

Plaintiff Shook does not assert that general personal jurisdiction exists in this case. Instead, Plaintiff Shook contends that Defendant Moundsville is subject to this Court's exercise of specific jurisdiction under Ohio's long-arm statute and that the exercise of such jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

To establish specific jurisdiction "over a non-resident corporation in a federal diversity matter, the defendant must be shown to meet one of the criteria enumerated in the Ohio long-arm statute Ohio Rev. Code Ann. §2307.382, and be within the bounds of constitutional due process." *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 510-11 (6th Cir. 2006) (citing *Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1115 (6th Cir. 1994)). "Although the Ohio Supreme Court has determined that the Ohio long-arm statute does not extend to the constitutional limits of the Due Process Clause, [the] central inquiry is whether minimum contacts are satisfied so as not to offend 'traditional notions of fair play and substantial justice.'" *Calphalon Corp. v. Rowlette*, 228 F.3d 718, 721 (6th Cir. 2000) (citing *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998)(citing *Goldstein v. Christiansen*, 70 Ohio St.3d 232, 638 N.E.2d 541, 545 n.1 (1994)).

7

The three-part test set forth in *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968) applies:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Calphalon Corp.*, 228 F.3d at 721 (quoting *Southern Machine*, 401 F.2d at 381).

It is essential for Plaintiff Shook to establish the purposeful availment prong of *Southern Machine. See Calphalon Corp.*, 228 F.3d at 721 (citing *LAK, Inc. v. Deer Creek Enterprises*, 885 F.2d 1293, 1300 (6th Cir. 1989)).

> This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts. There is a difference between what *World-Wide Volkswagen* calls a mere 'collateral relation to the forum State,' and the kind of substantial relationship with the forum state that invokes, by design, 'the benefits and protections of its laws.' An understanding of this difference is important to the proper application of the 'purposeful availment' test.
>
> The Supreme Court has emphasized, with respect to interstate contractual obligations, that "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequence of their activities."

*Calphalon Corp.*, 228 F.3d at 721-22 (quoting *LAK, Inc.*, 885 F.2d at 1300)(citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174 (1985); *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 100 S.Ct. 559 (1980); *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228 (1958)).

Plaintiff Shook contends that Defendant Moundsville "negotiated and executed a contract via telephone calls, e-mails, and letters to Shook, a Dayton, Ohio resident. Moundsville created an ongoing obligation to remit payment to Shook in Ohio and it did

so for more than two and one-half years. Clearly, Moundsville chose to deal with Shook and it chose to do so knowing that Shook was located in Ohio. Therefore, Moundsville purposefully availed itself of Ohio and its jurisdiction." (Doc. 9 at 11).

The existence of the parties' contract concerning the Project does not by itself automatically establish that Defendant Moundsville had sufficient minimum contacts with Ohio to support the exercise of personal jurisdiction over it. *See Burger King*, 471 U.S. at 478. Instead, the analysis requires "a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors – prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing – that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum." *Burger King*, 471 U.S. at 479 (internal citation omitted).

Plaintiff Shook has not shown by a preponderance of the evidence that Defendant Moundsville targeted Shook or any other general contractor in Ohio as a possible bidder on the Project. Instead, the evidence – particularly the testimony by James F. Woods, Defendant Moundsville's Superintendent – reveals that during the re-bidding proceedings, Defendant Moundsville neither targeted nor excluded contractors from a specific state from its search for a general contractor. Defendant Moundsville did not operate an Internet website concerning the Project. Defendant Moundsville did not send any invitation or instructions to bid on the Project to Plaintiff Shook in Ohio or to any contractor in Ohio.

The record lacks evidence explaining how the information about the Project found its way into the Internet database known as the Dodge Network. Defendant Woods states in his affidavit that to the best of his knowledge, Defendant Moundsville did not pay for distribution of materials about the Project on the Dodge Network. The record contains no

9

evidence showing that Defendant Moundsville submitted information about the Project to the Dodge Network. The record also lacks evidence contradicting Defendant Moundsville's assertion, through Woods' affidavit and testimony, that it never published notice about its bidding opportunities outside West Virginia. Based on these facts, Plaintiff Shook's use of the Dodge Network to track construction projects in West Virginia and other states does not show that Defendant Moundsville reached into Ohio to solicit business from Plaintiff or the business of any other Ohio general contractor.

In addition, even if Defendant Moundsville had intentionally submitted information about the Project to the Dodge Network, this was insufficient to show that Defendant Moundsville reached into Ohio to solicit business. Joe Mellon explained that the Dodge Network contains a national database of construction projects that can be searched by geographic region, state, or project type. Publishing information about the Project into a national database of this type, rather than to an Internet database targeted at Ohio contractors or businesses, to the exclusion of others, does not constitute purposeful availment. *Cf. Bird*, 289 F.3d at 874 ("The operation of an Internet website can constitute the purposeful availment ... 'if the website is interactive to a degree that reveals specifically intended interaction with residents of the state.'" *Neogen Corp. v. Neo Gen Screening, Inc.,* 282 F.3d 883, 890 (6th Cir. 2002)).

In addition, the substance of the parties' contract supports the conclusion that Defendant Moundsville did not create "the kind of substantial relationship with the forum state that invokes, by design, 'the benefits and protections of its laws.'" *Calphalon Corp*., 228 F.3d at 722 (quoting *LAK, Inc*., 885 F.2d at 1300). Although the contract led Defendant Moundsville to send payments to Plaintiff Shook in Ohio amounting to more than 15 million dollars, the vast bulk of the effects the parties' contract proximately caused occurred in West Virginia. The contract's main purpose and effect was the construction of the new water treatment facility in West Virginia. The new facility serves Defendant Moundsville's customers, all of whom live in West Virginia, none of whom

live in Ohio. Plaintiff Shook, as a successful bidder on the Project, was required to comply with West Virginia law rather than Ohio law. The majority of employees – perhaps as much as 80% – working on the Project resided in or near Marshall County, West Virginia.

The contract, moreover, did not result in an ongoing business relationship between Plaintiff Shook and Defendant Moundsville. It involved the construction of single water treatment facility under a finite time schedule. Once Plaintiff Shook completed the Project as required by the contract and once Defendant Moundsville made the final payment required by the contract, the contract placed no ongoing obligation on either party and created no ongoing business relationship between the parties. Although the Project lasted approximately two and one-half years, the contract was specifically time limited and did not contemplate any future dealings between the parties. The contract itself shows that at most Defendant Moundsville engaged in a single and isolated transaction with Plaintiff Shook, the nearly all the performance of which occurred in West Virginia, not Ohio. This conclusion is, moreover, confirmed by Woods' unrebutted testimony that the Project was the only business Defendant Moundsville has done with Plaintiff Shook and that Defendant Moundsville has no plans to engage in an ongoing business relationship with Plaintiff Shook.

Plaintiff Shook emphasizes that the existence of the parties' contract along with their negotiations, which involved Defendant Moundsville's acts of reaching into Ohio by telephone calls, emails, and letters to Shook in Ohio are sufficient to show purposeful availment. Plaintiff argues that the facts presented here are exactly like those in *PTG Logistics, LLC v. Bickel's Snack Foods, Inc*., 196 F.Supp.2d 593 (S.D. Ohio 2002)(Beckwith, D.J.), which states:

> '[I]f ... a nonresident defendant transacts business by negotiating and executing a contract via telephone calls and letters to an Ohio resident, then the defendant has purposefully availed himself of the forum by creating a continuing obligation in Ohio.'

11

196 F.Supp.2d at 600 (quoting *Cole v. Mileti*, 133 F.3d 433, 436 (6th Cir. 1998)). Although this statement if read in isolation enhances the significance of contacts in Ohio by way of telephone and email negotiations that lead to contract formation, care must be taken not to read this statement out of the factual context within which it was written. "It is the 'quality' of the contacts,' and 'not their number or their status as pre- or post-agreement communications' that determines whether they amount to purposeful availment." *Reynolds*, 23 F.3d at 1119 (quoting in part *LAK, Inc.*, 885 F.2d at 1301)(other citation omitted). "Moreover, '[t]he use of interstate facilities such as the telephone and mail is a 'secondary or ancillary' factor and 'cannot alone provide the minimum contacts required by due process.'" *Reynolds*, 23 F.3d at 1119 (citations omitted). The present case is factually distinguished from *PTG Logistics*, where the defendant's negotiations and conduct was sufficient to show that the defendant "knew it was creating a continuing obligation in Ohio and [that it] could have foreseen that its relationship with PTG could have consequences in Ohio...." 196 F.Supp.2d at 600-01. In contrast, Defendant Moundsville's contacts with Plaintiff Shook in Ohio were attenuated and fortuitous. As discussed above, Defendant Moundsville did not initially engage in any act indicating that it purposefully sought to conduct business with Plaintiff Shook or a general contractor in Ohio. Instead, it limited its publication of information about the Project to West Virginia or, at most, it placed information in a national Internet database, rather than a database targeting Ohio contractors to the exclusion of other states. The contacts between Plaintiff Shook and Defendant Moundsville then began to occur during the re-bidding process. The most substantial of those communications occurred in West Virginia during the inspection meetings and when Plaintiff Shook sent its bid and supporting documents to West Virginia. Then, after the bid was accepted and until the Project was completed, Defendant Moundsville's negotiations and other communications with Plaintiff Shook in Ohio arose because of the fortuitous reason that Plaintiff Shook's headquarters is located in Dayton, Ohio. "To borrow language employed ... in *LAK,* 885

F.2d at 1301, '[t]he telephone calls and letters on which the plaintiff's claim of jurisdiction primarily depends ... [are] precisely the sort of 'random,' 'fortuitous' and 'attenuated' contacts that the *Burger King* Court rejected as a basis for haling non-resident defendants into foreign jurisdictions.' *Id.* at 1300. See also *Scullin Steel Co. v. National Ry. Utilization Corp.,* 676 F.2d 309, 314 (8th Cir. 1982) ('The use of interstate facilities (telephone, the mail), the making of payments in the forum state, and the provision for delivery within the forum state are secondary or ancillary factors and cannot alone provide the 'minimum contacts' required by due process')." *Kerry Steel, Inc. v. Paragon Industries, Inc.*, 106 F.3d 147, 151 (6th Cir. 1997).

Looking deeper into the statement Plaintiff Shook relies on in *PTG Logistics*, it is a quote from *Cole v. Mileti*, 133 F.3d at 436, which is also factually distinguished from the present case and does not support Plaintiff's Shook's attempt to show personal jurisdiction. Unlike Plaintiff Shook and Defendant Moundsville's isolated and finite contract relationship – in both contractual duration and obligation – the parties in *Cole* engaged in a long-term and ongoing business relationship for many years. *See Cole*, 133 at 435; *see also Condon v. Flying Puck, LLC*, 35 Fed.Appx. 173, 174 (6th Cir. 2002) (distinguishing *Cole* by observing, "the Ohio plaintiff and the California defendant conducted an *ongoing* business relationship lasting over ten years, so that their business transactions 'continuously arose from plaintiff's activities in Ohio.'"); *Shaker Const. Group, LLC v. Shilling*, 2008 WL 4346777 at *6 (S.D. Ohio 2008)(Dlott, D.J.)("the facts of *Cole* are distinguishable from those in this case, most notably because *Cole* was a breach of contract action arising out of a contract between an Ohio resident and a California resident who had an ongoing business relationship for many years.").

Accordingly, Plaintiff Shook has not met its burden of showing that Defendant Moundsville purposefully availed itself of the privilege of acting in Ohio or causing a consequence Ohio. As a result, Plaintiff Shook has not shown that this Court's exercise of personal jurisdiction over Defendant Moundsville would comport with the Due Process

Clause of the Fourteenth Amendment.

Defendant Moundsville requests dismissal of this case for lack of personal jurisdiction. Because personal jurisdiction over Defendant Moundsville is lacking in this Court, and venue in this district is wrong. *See* 28 U.S.C. §1391(a)(3). Dismissal is therefore authorized under Rule 12(b)(2) and 28 U.S.C. §1406(a) unless the Court finds that transferring venue of the case to a district where it could have been brought should be accomplished "in the interest of justice." 28 U.S.C. §1406(a); *see* 28 U.S.C. §1631. A transfer of venue, rather than dismissal, is warranted in the interests of justice due to the presently pending and ongoing civil litigation in the United States District Court for the Northern District of West Virginia concerning the same Project and the same parties. Such a transfer will likely promote the just and efficient administration of justice and will likely advance the parties' interest in completely resolving their dispute.

### IV.   Motion to Transfer Venue

Defendant Moundsville alternatively seeks an Order transferring venue of this case to the Northern District of West Virginia under 28 U.S.C. §1404(a), which provides:

> For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

28 U.S.C. § 1404(a).

Defendant Moundsville, the moving party, bears the burden of demonstrating that a change of venue is warranted. *See Centerville ALF, Inc. v. Balanced Care Corp*., 197 F.Supp.2d 1039, 1049 (S.D. Ohio 2002) (Rice, Chief D.J.)(and cases cited therein); *see also Pearle Vision, Inc. v. N.J. Eyes, Inc*., 2009 WL 73727 at *8 (S.D. Ohio 2009)(Dlott, D.J.).

Venue of this case can be transferred to West Virginia under §1404(a) in part because venue is proper there. Defendant Moundsville resides in Moundsville, West Virginia; a substantial part of the events at issue – which relate to the construction Project

14

at issue – were performed there; and Defendant Moundsville is subject to personal jurisdiction in federal court in West Virginia. *See* 28 U.S.C. §1391(a).

Whether the case should be transferred under §1404(a) therefore depends on a number of factors. "In ruling on a motion to transfer under §1404(a), a district court should consider the private interests of the parties, including witnesses, as well as other public interest concerns, such as systemic integrity and fairness, which come under the rubric of 'interests of justice.'" *Moses v. Business Card Exp., Inc*., 929 F.2d 1131, 1137 (6th Cir. 1991)(citation omitted). "Although there is no definitive list of factors that must be considered in determining whether a change of venue is warranted, the district court may consider a number of case-specific factors, including but not limited to: 1) the nature of the suit; 2) the place of the events involved; 3) the relative ease of access to sources of proof; 4) the nature and materiality of testimony to be elicited from witnesses who must be transported; 5) the respective courts' familiarity with the applicable law and the conditions of their dockets; and 6) the residences of the parties." *Centerville ALF, Inc*., 197 F.Supp.2d at 1049 (footnote and citations omitted).

Defendant Moundsville does not dispute that it has not paid the remaining $200,000.00 due on the amount Plaintiff Shook requested in its final payment application. As a result, the parties' dispute does not focus on any factual dispute in Ohio relating to the amount of payments Plaintiff Shook received from Defendant Moundsville in Ohio. Instead, the parties' dispute focuses on conduct or events that occurred at the Project site in Moundsville, West Virginia. At its core, the case concerns a specific structure allegedly with specific construction defects located in West Virginia. As a result, the nature of the suit and the subject matter of the suit strongly favor a transfer to West Virginia.

Defendant Moundsville represents that it might be necessary for the jury to view the water treatment facility to see the allegedly defective equipment, a factor obviously favoring a transfer to West Virginia. Even if a jury view of the water treatment facility

turns out to be unnecessary, Defendant Moundsville presented testimony during the evidentiary hearing showing that it will likely present about twelve witnesses including five operators who work at the facility, members of the City of Moundsville's Board, and two mayors. Each of these witnesses lives near or in West Virginia. Although Plaintiff's witnesses will doubtlessly need to travel from Ohio to West Virginia for trial, most of the testimony at trial will likely concern construction-related activities on the Project in West Virginia, not Ohio. And Plaintiff Shook already needs its witnesses to travel to West Virginia to defend against the case presently pending against it in federal court in West Virginia. Transferring this case will almost certainly result in consolidation of this case, under Fed. R. Civ. P. 42, with the related case between the parties presently pending in federal court in West Virginia. The transfer thus creates no greater inconvenience for Plaintiff Shook's witnesses than they already face.

Lastly, under the parties' choice of law provision, West Virginia law will apply to this case, a factor favoring transfer to federal court in West Virginia where cases involving West Virginia law are more frequently litigated.

Accordingly, Defendant Moundsville has met its burden of showing that transfer of venue is warranted under 28 U.S.C. §1404(a).

## IT IS THEREFORE RECOMMENDED THAT:

1. Defendant Moundsville's Motion to Dismiss under Fed. R. Civ. P. 12(b)(2) be GRANTED, in part, to the extent that Plaintiff Shook has not met its burden of showing that the exercise of personal jurisdiction over Defendant Moundsville comports with the Due Process Clause of the Fourteenth Amendment. Yet rather than dismissal, venue of this case should be transferred to the United States District Court for the Northern District of West Virginia under 28 U.S.C. §1406(a) and 28 U.S.C.§1631;

2. Defendant Moundsville's Motion to Dismiss under Fed. R. Civ. P. 12(b)(2) be DENIED in part to the extent it seeks an Order dismissing this case; and

3. Defendant Moundsville's Alternative Motion to Transfer Venue (Doc. #4)

of this case to the United States District Court for the Northern District of West Virginia under 28 U.S.C. §1404(a) be GRANTED and the Clerk of Court be directed to so transfer this case.

February 12, 2010

                s/Sharon L. Ovington
                Sharon L. Ovington
              United States Magistrate Judge

# NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F). Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140 (1985).